: brian-anthony: grogan.
~G.P.O.-Box-21212
~el-cajon, ~calif. [92021]



FILED

OCT 08 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

[Plain-Simple-English & Plain-Simple-Counting-Systems]

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN A. GROGAN (sic) represented by SPC, Attorney-In-Fact) | ) Case No.: 24CV1618 JLS (DEB) |
| | ) **CLAIMANT, BRIAN A. GROGAN (sic)** |
| | ) **(1) : AMENDMENT FOR THE COMPLAINT INCLUDING DAMAGES:** |
| Claimant [Plaintiff], | ) |
| | ) **A. Violation of Fair Credit Reporting Act;** |
| vs. | ) **B. Violation of California Consumer Credit Reporting Agencies Act;** |
| ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC, MERSCORP HOLDINGS INC. dba MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC. a.k.a. "MERS", , FREEDOM MORTGAGE CORPORATION dba FREEDOM MORTGAGE, ALLY BANK, NATIONWIDE TITLE CLEARING, LLC, LARSON FINANCIAL HOLDINGS LLC dba CENLAR, FLAGSTAR BANK and all the following natural men/women individually known as: Stanley C. Middleman, Tracy Rogers, Steven Shaw, John Hillman, Giovanna Nicholson, Michael Middleman, Gregory Middleman and Does 1 to 50. | ) **C. INJUNCTIVE RELIEF(PURSUANT TO CAL. CIV. CODE§2924.[2].** |
| | ) **D. VIOLATIONS OF CAL. CIV. CODE§2923.6** |
| | ) **E. VIOLATIONS OF CAL. CIV. CODE§2923.55** |
| | ) **F. VIOLATIONS OF CAL. CIV. CODE§2923.7** |
| | ) **G. NEGLIGENT MISREPRESENTATION** |
| | ) **H. FRAUD AND DECEIT: INTENTIONAL FRAUDULENT MISREPRESENTATION** |
| | ) **I. VIOLATIONS OF BUS. & PROF. CODE§ 17200, ET SEQ.** |
| | ) **J. GENERAL NEGLIGENCE** |
| Defendants. | ) **(2) : CLAIMANT'S ANSWER TO JUDGE'S ORDER ORDERING TO SHOW CAUSE AS TO SUBJECT MATTER JURISDICTION.** |

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

# CLOSURE

1. This document is written in plain and simple English as required by the local rules of this court as well as for the comprehension of the second-grade-level-grammar-reader and is submitted with the duress as the Claimant's preference is to be completely correct and VOID ANY/ ALL SEMANTICS AND MULTIPLE VARIABLES OF THE MEANINGS AND DEFINITIONS OF THE WORDS AND THEIR SENTENCE-STRUCTURING TO FORM ARGUMENTS THAT ARE ENGINEERED FOR DAMAGING/ DISADVANTAGING OF THE CLAIMANT-PARTY and CAN/ WILL submit a mathematically certified Correct-Sentence-Structure-Communication-Parse-Syntax-Grammar-Claim for the voidance of the perjury upon request by any qualified authority requesting such document.

2. All statutes, codes, and laws cited in this document are with the forced usage by the local rules of this court thus waiving any requirements of any copyright release as the filing-payment received by this court is with the permissions of using such copyrights for the parties of the Constructive Trust for

the establishment of a level-[equal]-venue. If the court, authority or any party associated to this complaint should object to this copyright release for the Claimant [Plaintiff], let them speak now or forever hold their peace.

## STANDING

3. Claimant has standing to file the instant action as the real "party in interest" pursuant to Cal. Civ. Proc. Code§ 367, as he is the legal owner of the subject property and a party to the note.

COMES NOW Claimant BRIAN A. GROGAN(sic), an individual as defined by the broad definitions of this court, based on information and belief, to allege the following:

## FAIR CREDIT REPORTING ACT/ CA CONSUMER CREDIT REPORTING AGENCIES ACT

4. This case is amended with the allegations/ damages which fall under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 USC 1681i-(a)1, and the California Consumer Credit Reporting Agencies Act, California Civil Code

§1785.25(a). Claimant seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of the Claimant's debt which was also included in the Claimant's Chapter 13 bankruptcy.

5. The United States Congress has found that the banking system is highly dependent upon fair and accurate credit reporting. Inaccurate credit reports have been proven to directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

6. There exists today in the United States a pervasive and fundamental misunderstanding about the long-term impact filing a consumer's private dispute requesting validation/ verification dispute via the 'letter of the law' of the debt or a bankruptcy has on a consumer's credit worthiness. Specifically, many consumers believe that because a bankruptcy or a consumer's private dispute can be reported on their credit report for ten years their credit worthiness will be ruined for the same length of time. This is not true.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

7.  The *majority* of consumer Debtors who challenge Creditors validity/ validation of a debt or file consumer bankruptcy do so to *raise* their FICO Score and remedy their poor credit worthiness.

8.  It is entirely possible for consumer Debtors to have over a 700 FICO Score within as little as 12 months after filing a consumer bankruptcy (Chapter 7 or Chapter 13).

9.  Creditors and lending institutions are well aware of the misconception that filing a consumer bankruptcy destroys a consumer's credit worthiness for ten years.

10.  In an effort to perpetuate the aforementioned bankruptcy myth, creditors intentionally and routinely ignore credit reporting industry standards for accurately reporting bankruptcies and debts included in those bankruptcies in an effort to keep consumers 'credit scores low and their interest rates high.

11.  Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

12.  These credit reporting issues are most prevalent in Chapter 13 bankruptcy filings and unlawful default judgements.

13. Consequently, in the United States today it is objectively worse for consumers' credit worthiness to file Chapter 13 and pay back some or all of their debt, as opposed to filing Chapter 7 liquidation where Creditors generally receive nothing.

14. This was not the intent of Congress when enacting the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## **AMENDED ALLEGATIONS**

15. This matter concerns a massive scheme (conspiracy) of fraudulent, deceptive, unlawful, deceitful, and negligent business practices being carried out by the Defendants related to the foreclosure of California properties. Specifically, ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC, FREEDOM MORTGAGE CORPORATION dba FREEDOM MORTGAGE, MERSCORP HOLDINGS INC. dba MORTGAGE

ELECTRONIC REGISTRATION SYSTEMS INC. a.k.a. "MERS",

FLAGSTAR and CENLAR fail *to* properly, adequately, and fairly communicate

with defaulted borrowers regarding alternatives to foreclosure. These Defendants

systematically fail to provide proper notice of foreclosure sales and fail to review

loan modification requests/ applications in violation of California pre-foreclosure

statutes. The conduct of the Defendants is specifically designed to increase the

likelihood of foreclosure among California's hardship-stricken borrowers and

assure that borrowers, like the Claimant in the instant matter, are never afforded

consideration for programs, which would provide an alternative to foreclosure.

16. Pursuant to the Emergency Economic Stabilization Act of 2008, the U.S.

Department of Treasury implemented the Home Affordable Modification

Program ("HAMP") as a program, designed to provide affordable mortgage loan

modifications and alternatives to foreclosure to eligible borrowers. *See* Pub. L.

No. 110-343, 122 Stat. 3765 (codified as amended at 12 U.S.C. §5201-5253).

The centerpiece of the statute was the Trouble Asset Relief Program("TARP"),

through which the Secretary of the Department of Treasury was delegated broad

powers to mitigate the financial impact of the foreclosure crises and preserve homeownership. 12 U.S.C. §§ 5201, 5211-5241. Acting under this authority, the Secretary of the Treasury announced the "Making Homes Affordable Program" in February of 2009. One sup-part of this program is HAMP. The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.

17. Under HAMP, loan servicers are provided with at least $1,000 incentive payments from the government for each permanent mortgage loan modification completed. See Bosque 762 F.Supp.2d 342 (2011), at 347. Servicers must then use a two-step process for HAMP modification. Step one includes eligibility criteria, which borrowers must meet in order to qualify for a Trial Period Plan ("TPP"). Step two involves providing the borrower with an Agreement that outlines the terms of the final modification. (SD 09-01 at 14.)

18. However, lenders have misused the HAMP system, by engaging in what Attorney Generals call, "dual-tracking," but for homeowners struggling to avoid

foreclosure it may as well be called double-crossing. Dual-tracking refers to what is now a common lender tactic, where while a borrower in default seeks an alternative loss mitigation strategy (e.g. a short sale or a loan modification), the lender quietly continues to pursue foreclosure at the same time. In the meanwhile, in order to drag out the process, the bank sends numerous repetitive requests to the borrower to send additional documentation (which is often documents the borrower has already provided). As the borrower is lulled into thinking that his or her home will not be taken away, and as the bank continues to send ongoing duplicative requests for more information, the trustee's sale date sneaks upon the borrower and on the sale date the bank, via an assigned agent, immediately swoops in and conducts the trustee's sale in the midst of the loan modification process.

19. As a result of the lender's misuse of the HAMP system as well as unsound banking practices, effective January 1, 2013, Attorney General Kamala D. Harris's Homeowner Bill of Rights protects homeowners and borrowers during the mortgage and foreclosure process. The Homeowner Bill of Rights prohibits a series of inherently unfair bank practices that have needlessly forced thousands of

Californians, including Claimant into defaulting on their mortgages. **The law restricts dual-track foreclosures, where a lender forecloses on a borrower despite being in discussions over a loan modification to save the home.** It also guarantees struggling homeowners a single point of contact at their lender with knowledge of their loan and direct access to decision makers and imposes civil penalties on fraudulently signed mortgage documents. In addition, homeowners may require loan servicers to document their right to foreclose. A true and correct copy of the fraudulently signed mortgage/loan documents/ letters sent from Defendants are attached and included in document Exhibit-G.

20. The Homeowner Bill of Rights builds upon and extends reforms first negotiated in the recent national mortgage settlement between 49 states and leading lenders. Attorney General Harris secured up to $18 billion for California homeowners in that agreement and has also built a Mortgage Fraud Strike Force to investigate crime and fraud associated with mortgages and foreclosures. The Homeowner Bill of Rights consists of a series of related bills, including two identical bills that were passed on July 2, 2012, by the state Senate and Assembly:

AB 278 10 (Eng, Feuer, Perez, Mitchell) and SB 900 (Leno, Evans, Corbett, DeSaulnier, Pavley, Steinberg).

21. Claimant is entitled to continued possession and ownership of the parcel of residential real property, which is occupied by the Claimant and his family and is the primary residence, located at **1540 E CHASE AVENUE, EL CAJON CA 92020** (hereinafter the "Subject Property") with an A.P.N. of **498-260-03-00.**

22. On or around June 23, 2015, Claimant executed a Deed of Trust, recorded as Instrument Document# 2015-0324437, in the Official Records of the San Diego County Recorder's Office, which secured a first position mortgage against the subject property (hereinafter the "Deed of Trust").

23. The mortgage secured by the subject property was a highly unfavorable and unduly risky loan product, the proliferation of which would later come to be directly associated with the worst economic crash in United States history since the Great Depression.

24. FREEDOM MORTGAGE has been the mortgage servicer tasked with the day-to-day servicing of the subject loan as of the year 2019 and along with the assistance of Defendant MERS is claiming as investor and beneficiary of the subject loan.

25. Claimant is informed and believes that Defendants established and implemented a policy of deception and failed to disclose material facts about the underlying loan.

26. The lending Defendants knew that this scale of lending based upon inflated property values, without income verification and in violation of numerous other underwriting guidelines, would lead to widespread declines in property values, thereby putting Claimant into a grave situation whereby he would lose any equity in the subject property and have no means of refinancing or selling the subject property during the resulting market collapse.

27. Claimant has no experience beyond basic financial matters. Claimant was never explained the full terms of the underlying loan, including but not limited

to the rate of interest, how the interest rate would be calculated, what the amortization schedule would be, the risks and disadvantages of the loan, the prepayment penalties or the maximum amount of the monthly loan payment. In sum, Grogan was a victim of bait-and-switch practice whereby favorable loan terms were negotiated and were later supplanted by less favorable terms at the time of closing.

28. In response to a wildly unprecedented decrease in property values and additional hardships, which included the loss of business (clients dealing with their economic hardships) and the ill health of various family members including the death of his father, Grogan suffered from financial hardship and a large decrease in available household funds. Still, however, Claimant maintained a strong track record of timely payments from the conception of the questionable loan contract due under the mortgage until the alleged default.

29. Consequently, Grogan was forced to communicate with the FREEDOM MORTGAGE, the Mortgage Company, as they continued to apply his timely

payments inaccurately on the account making the account appear to be in a late status and accelerate the process of a default.

30. In December of 2022, Grogan called FREEDOM MORTGAGE and spoke to the 'General-Operator'/ agent who answered the phone to inquire about the account discrepancies over the past several months, delay in past and present payments made and not credited to the account in a timely manner placing the account in a 'late' status and options in disputing the discrepancies and possibly applying for a 'workout plan'. Grogan was given the run around by the agent thus ending the phone call exhausted and further confused.

31. Grogan continues to make timely payments (that are being reported late , affecting his credit scores, and charging late fees) and then on February 3, 2023, Servicer FREEDOM MORTGAGE CORPORATION on behalf of CMG FINANCIAL sent the Claimant, Grogan, a standard 'late notice' inquiring as to the Claimant's late payment and claiming to be a Debt Collector in California, but at that time FREEDOM MORTGAGE CORPORATION was not registered nor

licensed in California with the Department of Financial Protection and Innovation (DFPI) as required by law.

32. At this point, Grogan must protect his family and interests and files his first Mail-Fraud complaint with the United States Postal Inspector Service (USPIS) regarding the profound amount of fraud and criminal volitions used in the postal-article with the Postal Meter Number: 023 BIZUAP1 sent by FREEDOM MORTGAGE CORPORATION that could cause potential harm to the Claimant such as but not limited to: **~Title-15: USCS~1692e: Fraud & misleading statements, Title-42: USCS~1986: Knowledge & stop-correct-wrongs, ~FRCP-9-B: Fraud by confession, ~Title-18: USCS~1001 & 1002: Fictional/false-statements/communications, ~Title~15: USCS~78 ~ ff: Penalty: $25,000,000, ~Title~42: USCS~1985-1: Conspiracy-Civil, ~Title~18: USCS~242 & 241: Color of the law/ Criminal-Conspiracy=Tort, ~Title~18: 1961: RICO, ~Title~18: USCS~3: Criminal-Participation-Knowledge, ~Title~42: USCS~1983: Personal-Damages.**

33. After filing this complaint with the USPIS regarding the alleged Servicer-FREEDOM MORTGAGE CORPORATION and after researching, discovering that the company is conducting business in the State of California unlicensed/ with the Department of Financial Protection and Innovation (DFPI) as well as the lack of closure on the additional interests generated on the negotiable debt instruments out of the United States Treasury and the Note/ Security Instrument transferred over three (3) times in the course of 6 years combined with the profound amount of Mortgage Scams being conducted in the U.S. Market at the time, Claimant Grogan was left with very little options. As the Protector/ Principal/ Guardian/ CFO/ SPC/ Authorized-Agent of the BRIAN A. GROGAN Corporate Entity, : brian-anthony: grogan the living-breathing man, began to research further into the mortgage lending process/ deed/ title on file with the San Diego County Recorder's Office and found that FREEDOM MORTGAGE CORPORATION was not even listed nor assigned to the deed thus, was without any authority and in violation of numerous Federal and California Laws.

34. Claimant researched and educated himself further and became aware of many criminal violations being committed by the Defendants that are required by: The Homeowner's Bill of Rights, Fair Debt Collections Practice Act, California's Rosenthal Act which all have specific requirements for debt collectors. 15 U.S.C. §1692g-Validation of Debts *(b)Disputed debts-*

*If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the*

*consumer requests the name and address of the original creditor. Any collection*

*activities and communication during the 30-day period may not overshadow or*

*be inconsistent with the disclosure of the consumer's right to dispute the debt or*

*request the name and address of the original creditor.*

35. Directly after, on March 3, 2023, Claimant Grogan remaining in honor and attempting to settle Accounts for the Corporation BRIAN A. GROGAN, sent Defendant Stanley C. Middleman, Founder/CEO of FREEDOM MORTGAGE CORPORATION (defendant "Stanley") via USPS Registered Mail #: RF-504-652-575US, a private-post-article in regard to a **'Notice of Debt Validation/ Verification of Claim'** with a ten (10) day response time requesting: validation of the alleged debt, a copy of the signed contract by both parties, a true and certified copy of the Original Note (Credit Agreement) and any information regarding the Original-Note being sold and the duly authorized representative from their company, who has carried out due diligence under the Money Laundering Control Act of 1986 and what actions s/he has taken in relation to this account.

36. Defendant Stanley fails to respond within the ten (10) day period thus Grogan sent a second private-post-article to Stanley on March 14, 2023, via USPS Registered Mail #: RF-504-652-540US with the same requests regarding accounting, Original Note, a duly authorized representative, and overall validation/ verification of the debt/ loan with a ten (10) day period to respond.

37. Defendant Stanley finally responds to Grogan on March 22, 2023, with a standard 'late notice' and monthly Mortgage Statement entirely disregarding the private-post-articles of request Grogan had sent regarding the Account. At this point, Grogan files his second mail-fraud complaint with the United States Postal Inspector Service (USPIS) regarding the Fraud and Misleading Statements- Title~15: USCS~1692e/ Fictional Communications- Title 18 USCS 1001 & 1002 used in Postal-Article with the Postal Meter Number: 023 BIZUAP1.

38. Claimant Grogan sends a third private-post-article of response to Stanley on March 27, 2023, via USPS Registered Mail #: RF-504-652-536US with the same requests regarding accounting, Original Note, a duly authorized

representative, and overall validation/ verification of the debt/ loan with a ten (10) day period to respond, allowing Stanley an **'Opportunity to Cure'**.

39. On April 6, 2023, Stanley sends a postal article in regard to a balance due and nothing regarding the private requests Grogan has made three (3) times regarding the validation of debt, accounting, etc.

40. Grogan is compelled to file a third mail-fraud complaint with the United States Postal Inspector Service (USPIS) regarding the Fraud and Misleading Statements-Title~15: USCS~1692e/ Fictional Communications- Title 18 USCS 1001 & 1002 used in Postal-Article with the Postal Meter Number: 023 CIZVAP1 92020.

41. As a result of Stanley's dishonor in commerce and absence of any response to Grogan's three private requests, Grogan issues a fourth private-post-article on April 7, 2023, ordering a **'Notice of Final Default and Estoppel'** sent to Stanley via USPS Registered Mail #: RF-352-952-645US, due to Stanley's lack of

response, breach of contract, fraud and all other items stated in the private-post-articles.

42. At this time, the entire family of Grogan is dealing with direct-family-health-issues between the Mother who has critical-health-complications including intensive heart clots and the brother who went to the hospital due to a stroke. Both to date, continue to need assistance in living showing little or no improvement.

43. April 20, 2023, defendant Stanley violates the ordered Estoppel by sending a postal article to Grogan regarding collection of a balance of $15,967.80 and nothing in regard to the Notice of Default/Estoppel that was ordered/ issued to Stanley a few weeks prior.

44. April 20, 2023, Grogan files his fourth Mail-Fraud complaint with the United States Postal Inspector Service (USPIS) regarding the Fraud and Misleading Statements-Title~15: USCS~1692e/ Fictional Communications- Title 18 USCS 1001 & 1002 used in Postal-Article sent to Grogan.

45. On April 27, 2023, already in default, defendant Stanley finally sends Grogan an **Acknowledgment Letter stating that Grogan's letters/ requests towards the Account are under review.**

46. A few weeks later, on May 16, 2023, defendant Stanley violates the Estoppel again by sending Grogan a standard notice of generic information and nothing regarding Grogan's numerous requests of the Account that he was told was under review nor any results of such review, thus operating in dishonor of commerce.

47. On May 18, 2023, defendant Stanley continues to harass Grogan by sending a monthly mortgage statement with an overdue balance.

48. May 23, 2023, Defendant Tracy Rogers, claiming to be vice president and present beneficiary of MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC. ("MERS"), *as nominee for CMG MORTGAGE, INC DBA CMG FINANCIAL its successor's and assigns, (assignor) under the deed of trust for the alleged loan*, records a **Corporate Assignment of Deed of Trust** *conveying,*

*granting, transferring and setting all of its rights, title, and interest in the*

*described Deed of Trust, representation or warranty, including all liens and any*

*rights due or to become due to FREEDOM MORTGAGE CORPORATION* as

described on the CORPORATE ASSIGNMENT DEED OF TRUST recorded on

May 31, 2023 at the SAN DIEGO COUNTY RECORDER'S office DOC#: 2023-

0141073.

49. On June 1, 2023, defendant Stanley harasses Grogan once again by

sending another duplicate copy of the standard notice with generic information

packet and again, nothing regarding Grogan's requests or any review results.

50. On June 26, 2023, defendant Stanley damages/ dishonors/ harasses

Grogan again by sending Grogan a **'Notice of Referral to Foreclosure'**.

51. Shockingly, on or about June 28, 2023, which is almost **a month later**,

Defendant ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT

LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC

via Defendant Giovanna Nichelson, Trustee Sale Officer of NESTOR

SOLUTIONS, LLC claiming as active trustee under Deed of Trust (SAN DIEGO COUNTY RECORDER DOC#: 2023-0169328) records a Notice of Default ("NOD") and Election to Sell under Deed of Trust against the Subject Property claiming that Grogan was in default on the alleged loan in the amount of $20,611 as Instrument Document No. 2023-169328.

52. Claimant alleges that the amount of the alleged default claimed in the Notice of Default was not accurate and complete and lacks support by competent and factual evidence.

53. Defendants are also in violation of CA Civil Code Section 2934 as they failed to perform the following as stated, *"a substitution executed pursuant to subparagraph (B) of paragraph (1) is not effective unless all the parties signing the substitution sign, under penalty of perjury, a separate written document stating the following:(A) The substitution has been signed pursuant to subparagraph (B) of paragraph (1); (C) The undersigned together hold more than 50 percent of the record beneficial interest of a series of notes secured by the same real property or of undivided interests in a note secured by real*

*property equivalent to a series transaction. (D)Notice of the substitution was sent by certified mail, postage prepaid, with return receipt requested to each holder of an interest in the obligation secured by the deed of trust who has not joined in the execution of the substitution or the separate document. The separate document shall be attached to the substitution and be recorded in the office of the county recorder of each county in which the real property described in the deed of trust is located. Once the document required by this paragraph is recorded, it shall constitute conclusive evidence of compliance with the requirements of this paragraph in favor of substituted trustees acting pursuant to this section, subsequent assignees of the obligation secured by the deed of trust and subsequent bona fide purchasers or encumbrancers for value of the real property described therein."*

54. The NOD was recorded despite the fact that the Debtor/ Consumer Dispute was pending, in direct contravention with §2923.6.

55.  The NOD was recorded despite the fact that FREEDOM represented to Claimant that Prior to recording the NOD, neither the Defendants nor any of their

authorized agents contacted the Claimant in order to assess his financial situation and explore options for the borrowers to avoid foreclosure, as required by §2923.55(6)(2).

56. Neither the Defendants nor any of their authorized agents advised the Claimant of the statutory right to request a meeting regarding foreclosure alternatives which would be scheduled within fourteen (14) days, as required by §2923.55(6)(2).

57. Neither the Defendants nor any of their authorized agents provided Claimant with a toll-free telephone number to contact a United States Department of Housing and Urban Development (HUD) certified housing counseling agency as required by §2923.5(6)(2).

58. Neither the Defendants nor any of their authorized agents employed due diligence in an effort to contact the Claimant as required by §2923.5(6)(2).

59. Thus, it is clear that FREEDOM MORTGAGE conducted its review of the dispute and 'Workout Plan' in bad faith and without due care.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

60. July 18, 2023, defendant Stanley harasses Grogan once again with another post article regarding a balance due/ late notice.

61. Several months have passed without any communication from Stanley's last mailing of July 18, 2023.

62. On September 29, 2023, Grogan is served with a 'Notice of Trustee's Sale' scheduled for November 1, 2023, at 10:00AM at the entrance to the East County Regional Center by the statue, 250 E. Main St., El Cajon, CA 92020 for the amount of unpaid balance and other charges of $492.127.28.

63. On October 9, 2023, Grogan receives another 'Notice of Trustee's Sale' from Nestor attached to his front gate.

64. On October 18, 2023, in response to this posting from Defendant Nestor, Grogan issues a private-postal-article sent via USPS Certified #: 9589-0710-5270-1298-9785-42(FREEDOM) and 9589-0710-5270-1298-9785-35 (Nestor) to Defendants FREEDOM and Nestor giving notice pursuant to the Fair Debt Collection Practices Act, Title 15 USC-1692g§809(b) that the debt is disputed, and

validation is again requested. Notice of violations of the Fair Credit Reporting Act,

Fair Debt Collection Practices Act, and; defamation of character was also stated in

the demand letter along with a cease and desist on any collection activity for a

period of 30 days once Grogan receives the requested documentation for sufficient

time for investigation of these documents.

65. On October 20, 2023, Grogan issues a private-postal-article sent via

USPS Certified #: 9589-0710-5270-1298-9785-11(FREEDOM) and 9589-0710-

5270-1298-9785-28 (Nestor) to Defendants FREEDOM and Nestor giving notice

pursuant to the Fair Debt Collection Practices Act, Title 15 USC-1692g§809(b)

that the debt is disputed, and validation is again requested. Notice of violations of

the Fair Credit Reporting Act, Fair Debt Collection Practices Act, and; defamation

of character was also stated in the demand letter along with a cease and desist on

any collection activity for a period of 30 days once Grogan receives the requested

documentation for sufficient time for investigation of these documents.

66. As the Defendant's Stanley C. Middleman dba FREEDOM

MORTGAGE and MERS have been in commercial Default Status since April 7,

2023, in regard to the unverified security instrument, unverified DEED OF TRUST and unverified Account/ Debt, Grogan as active Secured Party Creditor ("SPC")/ Protector/ Guardian/ Trustee, Secured-Party, Principal/ Attorney-in-fact/ Authorized-Agent and Bailee of the BRIAN ANTHONY GROGAN(sic) ordered and recorded a QUITCLAM DEED conveying, granting, transferring and setting all of its rights, Certificate of Acceptance of Declaration of United States Land-Patent-Lodial-Title #989 dated September 3, 1890 and held in the public trust by the UNITED STATES BUREAU OF LAND MANAGEMENT and claimed with authority by the living-man : brian-anthony: grogan with a certified copy dated September 28, 2021 and  published in the UPTOWN SAN DIEGO EXAMINER ON APRIL-MAY 2022, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA (2015.5 C.C.P); and all interest in the Real Property to a Private Secured Party held in trust, representation or warranty, including all rights as described on the QUITCLAIM DEED recorded on November 30, 2023 at the SAN DIEGO COUNTY RECORDER'S office DOC#: 2023-0330738. A true and correct copy of this QUITCLAIM DEED, Certificate of

Acceptance of Declaration of United States Land-Patent-Lodial-Title #989 dated September 3, 1890, with a certified copy dated September 28, 2021, published in the UPTOWN SAN DIEGO EXAMINER ON APRIL-MAY 2022, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA (2015.5 C.C.P), are attached as document Exhibit-E.

67. With no response from the Defendants Stanley or Nestor nor having any of the requested files or documentation for validation/ verification of the alleged debt and accounting as requested, Grogan has no choice but to file for a potential bankruptcy with the UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF CALIFORNIA on November 30, 2023, DOCKET/ CASE# 23-03758-MM13, seeking to validate any and all claims made by creditors so he may honor and satisfy any valid contracts and put a halt to this highly stressful legal dispute, threatening to damage the Estate.

68. On December 4, 2023, Claimant Grogan is served with a 'NOTICE OF POSTPONEMENT OF TRUSTEE'S SALE' by Defendant NESTOR SOLUTIONS, LLC.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

69. Attempting to rectify this dispute, on December 30, 2023, Grogan again sends the Defendants CMG, FREEDOM, MERS, NATIONWIDE TITLE CLEARING, LLC and CENLAR a Notice of Conditional Acceptance of Debt Upon Proof of Claim via USPS Registered Mail #: RF-565-963-364US/ RF-565-963-378US/ RF-565-963-381US/ RF-565-963-395US/ RF-565-963-404US and RF-565-963-418US.

70. On January 26, 2024, Grogan sends the Defendants CMG, FREEDOM, MERS, NATIONWIDE TITLE CLEARING, LLC and CENLAR a second (2nd) Notice of Conditional Acceptance of Debt Upon Proof of Claim/ Notice of Fault/ Opportunity to Cure via USPS Registered Mail .

71. As a defense to the Organized-Crime, on February 1, 2024, Claimant files a complaint against Stanley C. Middleman d.b.a. FREEDOM MORTGAGE CORPORATION, CMG MORTGAGE and other parties involved in the conspiracy with the SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF SAN DIEGO Case No.: 37-2024-00005749-CU-FR-CTL of which Judge Blaine K. Bowman has shown to be extremely bias and

discriminatory against the Claimant and has disregarded all documentation submitted to the court and essentially 'steam-rolling' over the Clamaint and is attempting to expedite the court into a speedy trial for a judgement against the Claimant in protecting the Defendants and with little or no justice and damaging Grogan.

72. On February 15, 2024, Grogan sends the Defendants CMG, FREEDOM, MERS, NATIONWIDE TITLE CLEARING, LLC and CENLAR a third (3rd) Notice of Final Default/ Estoppel via USPS Registered Mail.

72. On May 7, 2024, Grogan contracts a California Judicial Officer of the Secretary of State/ Notary (Lancelot Knight, Commission # 2466275 which expires November 8, 2027) to serve Defendants Stanley via USPS Certified Mail #: 9589-0710-5270-1615-7264-12 and Defendant Tracy (MERS) via USPS Certified Mail #: 9589-0710-5270-1615-7264-29 both a NOTICE OF ACCEPTANCE/ PRESENTMENT/ REQUEST FOR STATEMENT OF ACCOUNT AND TENDER FOR SETOFF OF ACCOUNT as Defendants ignored all other 40 plus mailings sent so he researched that a Notary-Protest performed by a California

Judicial Officer would make the Defendants accountable, especially in a court of law.

73. On June 14, 2024, Grogan again contracts Lancelot Knight-Notary to serve Defendants Stanley via USPS Certified Mail and Defendant Tracy (MERS) via USPS Certified Mail both an ADMINISTRATIVE JUDGMENT.

74. July 3, 2024, Grogan sends a NOTICE AND AFFECT OF FAILURE TO RESPOND and CONFIRMATION LETTER via USPS Certified Mail #: 7022-3330-0000-6698-4597 to Stanley C. Middleman dba FREEDOM MORTGAGE CORPORATION located at 20 Lake Center Drive, Marlton, NJ 08053 and are attached as document **Exhibit-H**.

75. Still no word from the Defendants, Grogan sends on July 8, 2024, via Lancelot Knight-Notary a NOTICE OF TERMINATION OF INTEREST via USPS Express Priority Mail# EJ 913-665-162 US to Stanley C. Middleman dba FREEDOM MORTGAGE CORPORATION located at 20 Lake Center Drive, Marlton, NJ 08053 and is attached as document **Exhibit-I**.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

76. During the entire dispute period starting in February of 2023, Defendant FREEDOM MORTGAGE continued to charge the full amount to Claimant without deducting principal of $1,178.56 and escrow/ tax/ insurance of $1,373.00 and adding these to come up with their total charge.

77. On July 10, 2024, Defendant ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC holds a non-authorized/ fraudulent non-judical foreclosure on the subject property to a supposedly third party for the total amount of $951,000.00 leaving excess proceeds (surplus) of roughly $461,524.00 which to date has not been received or even mentioned/ offered to Claimant who is the owner of the home sold with duress. This is in direct violation of CA Civil Code 2924j which states the following:

*(a) Unless an interpleader action has been filed, within 30 days of the execution of the trustee's deed resulting from a sale in which there are proceeds remaining after payment of the amounts required by paragraphs (1) and (2) of subdivision (a) of Section 2924k, the trustee shall send written notice to all persons with recorded interests in the real property as of the date immediately prior to the trustee's sale who would be entitled to notice pursuant to subdivisions (b) and (c) of Section 2924b. The notice shall be sent by first-class mail*

*in the manner provided in* [paragraph (1) of subdivision (c) of Section 2924b](#) *and inform each entitled person of each of the following:*

*(1) That there has been a trustee's sale of the described real property.*

*(2) That the noticed person may have a claim to all or a portion of the sale proceeds remaining after payment of the amounts required by* [paragraphs (1)](#) *and* [(2) of subdivision (a) of Section 2924k](#).

*(3) The noticed person may contact the trustee at the address provided in the notice to pursue any potential claim.*

*(4) That before the trustee can act, the noticed person may be required to present proof that the person holds the beneficial interest in the obligation and the security interest therefor. In the case of a promissory note secured by a deed of trust, proof that the person holds the beneficial interest may include the original promissory note and assignment of beneficial interests related thereto. The noticed person shall also submit a written claim to the trustee, executed under penalty of perjury, stating the following:*

*(A) The amount of the claim to the date of trustee's sale.*

*(B) An itemized statement of the principal, interest, and other charges.*

*(C) That claims must be received by the trustee at the address stated in the notice no later than 30 days after the date the trustee sends notice to the potential claimant.*

*(b) The trustee shall exercise due diligence to determine the priority of the written claims received by the trustee to the trustee's sale surplus proceeds from those persons to whom notice was sent pursuant to subdivision (a). In the event there is no dispute as to the priority of the written claims submitted to the trustee, proceeds shall be paid within 30 days after the conclusion of the notice period. If the trustee has failed to determine the priority*

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

*of written claims within 90 days following the 30-day notice period, then within 10 days thereafter the trustee shall deposit the funds with the clerk of the court pursuant to subdivision (c) or file an interpleader action pursuant to subdivision (e). Nothing in this section shall preclude any person from pursuing other remedies or claims as to surplus proceeds.*

*(c) If, after due diligence, the trustee is unable to determine the priority of the written claims received by the trustee to the trustee's sale surplus of multiple persons or if the trustee determines there is a conflict between potential claimants, the trustee may file a declaration of the unresolved claims and deposit with the clerk of the superior court of the county in which the sale occurred, that portion of the sales proceeds that cannot be distributed, less any fees charged by the clerk pursuant to this subdivision. The declaration shall specify the date of the trustee's sale, a description of the property, the names and addresses of all persons sent notice pursuant to subdivision (a), a statement that the trustee exercised due diligence pursuant to subdivision (b), that the trustee provided written notice as required by subdivisions (a) and (d) and the amount of the sales proceeds deposited by the trustee with the court. Further, the trustee shall submit a copy of the trustee's sales guarantee and any information relevant to the identity, location, and priority of the potential claimants with the court and shall file proof of service of the notice required by subdivision (d) on all persons described in subdivision (a).*

*The clerk shall deposit the amount with the county treasurer or, if a bank account has been established for moneys held in trust under paragraph (2) of subdivision (a) of Section 77009 of the Government Code, in that account, subject to order of the court upon the application of any interested party. The clerk may charge a reasonable fee for the performance of activities pursuant to this subdivision equal to the fee for filing an interpleader action pursuant to Chapter 5.8 (commencing with Section 70600) of Title 8 of the Government Code. Upon deposit of that portion of the sale proceeds that cannot be distributed by due diligence, the trustee shall be discharged of further responsibility for the disbursement of sale proceeds. A deposit with the clerk of the court*

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

*pursuant to this subdivision may be either for the total proceeds of the trustee's sale, less any fees charged by the*

*clerk, if a conflict or conflicts exist with respect to the total proceeds, or that portion that cannot be distributed*

*after due diligence, less any fees charged by the clerk.*

*(d) Before the trustee deposits the funds with the clerk of the court pursuant to subdivision (c), the*

*trustee shall send written notice by first-class mail, postage prepaid, to all persons described in subdivision (a)*

*informing them that the trustee intends to deposit the funds with the clerk of the court and that a claim for the*

*funds must be filed with the court within 30 days from the date of the notice, providing the address of the court in*

*which the funds were deposited, and a telephone number for obtaining further information.*

*Within 90 days after deposit with the clerk, the court shall consider all claims filed at least 15 days*

*before the date on which the hearing is scheduled by the court, the clerk shall serve written notice of the hearing*

*by first-class mail on all claimants identified in the trustee's declaration at the addresses specified therein. Where*

*the amount of the deposit is twenty-five thousand dollars ($25,000) or less, a proceeding pursuant to this section*

*is a limited civil case. The court shall distribute the deposited funds to any and all claimants entitled thereto.*

*(e) Nothing in this section restricts the ability of a trustee to file an interpleader action in order to resolve*

*a dispute about the proceeds of a trustee's sale. Once an interpleader action has been filed, thereafter the*

*provisions of this section do not apply.*

*(f) "Due diligence," for the purposes of this section means that the trustee researched the written claims*

*submitted or other evidence of conflicts and determined that a conflict of priorities exists between two or more*

*claimants which the trustee is unable to resolve.*

*(g) To the extent required by the Unclaimed Property Law, a trustee in possession of surplus proceeds not required to be deposited with the court pursuant to subdivision (b) shall comply with the Unclaimed Property Law (Chapter 7 (commencing with Section 1500) of Title 10 of Part 3 of the Code of Civil Procedure).*

*(h) The trustee, beneficiary, or counsel to the trustee or beneficiary, is not liable for providing to any person who is entitled to notice pursuant to this section, information set forth in, or a copy of, subdivision (h) of Section 2945.3.*

78. Over the entire dispute period Defendants FREEDOM MORTGAGE and ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC delayed the review process by continuing to send Claimant generic-information documents and late statements, completely ignoring more than forty (40) communications sent by the Claimant in requests of valid verification/ accounting/ modifications to be made to remain in honor of said account.

79. Defendants completed this practice over and over again.

80. Defendants FREEDOM MORTGAGE and ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC would acknowledge receipt of the

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

documents via signature and then later would ask or send more futile documents unrelated to the requests made by Claimant.

81. This practice is well known in the industry as the "document revolving door."

82. The "document revolving door" practice is a common tactic used by mortgage servicers to delay the review process of foreclosure prevention alternatives in order to sneak in a foreclosure sale when the borrower is not expecting it.

82. The combined failures of the Defendants and their representatives to fail to immediately remove, redact, retract, and cause to be void, all foreclosure notices and foreclosure dates associated with the subject property is the product of willful, intentional, despicable and deceitful conduct.

83. The conduct of the Defendants, as alleged herein, was designed to avoid any discussion of foreclosure alternatives with Claimant and to pursue foreclosure

of a loan, which was unaffordable at its inception without performing those pre-foreclosure mandates required by California law.

84. Grogan tried numerous times to pursue foreclosure prevention alternatives but was thwarted by Defendants' fraudulent, unlawful, and negligent conduct in each and every instance.

85. Claimant now faces the loss of the Subject Property due to the fraudulent/ non-authorized Trustee Sale and has lost the opportunity to pursue other foreclosure prevention options that he would have pursued due to the Defendant's failure to review Claimant for alternatives to foreclosure.

86. A claimant seeking any injunctive relief is required to demonstrate that he will suffer immediate and irreparable injury due to the inadequacy of other legal remedies. People ex rel. Gow v. Mitchell Brothers' Santa Ana Theater (1981), 118 Cal.App.3d 863. Irreparable harm is often related to an "inadequate legal remedy," where relief cannot be granted unless a party is injured in a way, which cannot later be repaired. Id at 870-71.

87. In addition, the threat of "irreparable harm" must be imminent, as opposed to a mere possibility of harm sometime in the future, in that the threat "must be supported by actual evidence that there is a realistic prospect that the party enjoined intends to engage in the prohibited activity." Korean Philadelphia Presbyterian Church v. California Presbytery (2000) 77 Cal.App.41 1069.

88. Furthermore, the Court in Nichols v. DEUTSCHE Bank Nat. Trust Co. (2007) WL 4181111, at *3, held that "the imminent foreclosure of Plaintiffs residence presents a threat of irreparable harm." Similarly, in Wrobel v. S.L. Pope & Associates, (2007) WL 2345036, at* l, the Court found that "losing one's home through foreclosure is an irreparable injury."

89. Defendants non-judicial foreclosure is both imminent and would constitute an irreparable harm in that, pursuant to Civil Code § 3387, all real property is deemed "unique," so any injury/loss cannot be compensated in damages, and injunctive relief is therefore readily granted. As such, there is no adequate remedy at law, which will compensate Claimant for the loss of the Subject Property.

90. Furthermore, Pursuant to California Code, Civil Code - CIV §
2924.12(b) states,

*"(b) After a trustee's deed upon sale has been recorded, a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall be liable to a borrower for actual economic damages pursuant to Section 3281, resulting from a material violation of Section 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, or 2924.17 by that mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent where the violation was not corrected and remedied prior to the recordation of the trustee's deed upon sale. If the court finds that the material violation was intentional or reckless, or resulted from willful misconduct by a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent, the court may award the borrower the greater of treble actual damages or statutory damages of fifty thousand dollars ($50,000)."*

91. Claimant alleges that each and every defendant data furnisher was included in Claimant's Chapter 13 bankruptcy filing.

92.. Claimant alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

93. Claimant alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in

denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

94. Claimant alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Grogan's ability to reorganize and repair his FICO Score.

95. In the alternative Claimant alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FICO, Inc.

96. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

97. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

98. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

99. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

100. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

101. There are 28 FICO Scores that are commonly used by lenders.

102. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

103. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

104. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

105. There are five key factors that a FICO Score considers: 1) Payment History 2) Amount of Debt 3) Length of Credit History 4) New Credit and 5) Credit Mix.

106. Each of the five factors is weighted differently by FICO.

107. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

108. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record

items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

109. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

110. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

111. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

112. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and for both, FICO uses the FILING DATE to determine how long ago the bankruptcy took place.

## **Metro 2**

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

113. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

114. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

115. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

116. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

117. The CDIA is *The* expert on accurate credit reporting. In support of this allegation, Claimant avers the following:

a. The CDIA offers a FCRA certificate program for all CRAs.

b. The CDIA offers a FCRA awareness program for all CRAs.

c. The CDIA offers a FCRA Certificate program for DFs.

d. The CDIA offers a FCRA awareness program for DFs.

e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.

g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

118. The CDIA's Metro 2 is accepted by all CRAs.

119. The credit reporting accepted industry standards for reporting metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).

120. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

121. The CRRG is not readily available to the public.

122. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

123. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

124. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

125. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower

a consumer will be considered a higher credit risk resulting in less favorable lending terms.

## e-OSCAR

126. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax, Inc.; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

127. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

128. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

## Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator

129. When a consumer files bankruptcy certain credit reporting industry standards exist.

130. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

131. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

132. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

133. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

134. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

135. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. This is usually translated on a consumer

credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

136. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

137. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

138. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

139. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

140. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

141. The lack of a CII reported also suggests that creditors are free to collect against a consumer as an individual or that no stay exists to prevent *in personam* collection activity.

142. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

143. Under the Fair Credit Reporting Act, a bankruptcy can be reported for ten years.

144. The ten-year rule for reporting runs from the date the bankruptcy was *filed.*

*145.* A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

146. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

147. Failure to reference the bankruptcy filing (CII field) and or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

## **Pre-Confirmation Credit Reporting Standards Regarding Balances and Ongoing Payments When All Borrowers File Chapter 13**

148. Certain credit reporting standards exist on how to accurately and completely report balances on consumer debts pre plan confirmation.

149. Pre confirmation the accepted credit reporting standard for accurately and completely reporting a balance included in a Debtor's chapter 13 plan is to report the outstanding balance amount as of the date of filing.

150. Pre confirmation the accepted credit reporting standard for accurately and completely reporting a scheduled monthly payment amount is to report the contractual monthly payment amount.

151. Pre confirmation the accepted credit reporting standard for accurately and completely reporting a past due balance is to report the past due amount as of the time the petition was filed.

152. Pre confirmation the accepted credit reporting standard for accurately and completely reporting ongoing payments is to report the Metro 2 indicator D in Field 18 which means no payment history available this month.

153. Within the credit reporting industry, the Metro 2 indicator D is seen as accurately and completely illustrating that the automatic stay of the bankruptcy is preventing ongoing collection activities against the debtor and creditors are not anticipating receiving payments directly from the debtor. The Metro 2 indicator D thus simultaneously illustrates to those making credit decisions that payments were NOT made and received but also NOT anticipated.

154. Deviation from the aforementioned credit reporting industry standards shall result in a more negative inference being drawn with respect to a consumer's credit worthiness.

# Post Confirmation Credit Reporting Standards Regarding Balances and Ongoing Payments When All Borrowers File Chapter 13

155. Certain credit reporting standards exist on how to accurately and completely report balances and past due balances post plan confirmation.

156. Post confirmation the accepted accurate credit reporting standard for reporting balances is to report the balance owed under the Chapter 13 plan terms. The balance should decrease with payments made.

157. If the plan does not call for payments to be made on a particular debt the accurate credit reporting standard is to report a $0.00 balance.

158. Post confirmation the accepted accurate credit reporting standard for reporting past due balances is to report a $0.00 past due balance.

159. Post confirmation the accepted accurate credit reporting standard for monthly payments is the Chapter 13 plan payment amount.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

160. Post confirmation the accepted accurate credit reporting standard for payment history is to report the Metro 2 indicator D each month. Reporting ongoing past due amounts and ongoing late payments are not generally accepted as accurate by the credit reporting industry.

161. Claimant alleges that the aforementioned industry standards are all readily available in the CRRG which each and every Defendant subscribes thereto.

162. The CDIA and credit reporting industry recognize that allowing Creditors to continuously report on going delinquencies and past due balances post confirmation would objectively make filing Chapter 13 and repaying Creditors exponentially worse for a consumer's credit worthiness as opposed to filing Chapter 7. Thus, deviation from the aforementioned credit reporting industry standards shall result in a more negative inference being drawn with respect to a consumer's credit worthiness.

### **Claimants Bankruptcy Filing**

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

163. Grogan filed for Chapter 13 bankruptcy protection on November 30, 2023, in order to reorganize and repair Claimant's credit worthiness and FICO Score.

164. Chapter 13 of the Bankruptcy Code is titled "***Adjustment of Debts*** of an Individual with Regular Income."

165. Chapter 13 allows financially overextended individual debtors to make greater voluntary use of repayment plans commensurate with each debtor's abilities, as the most effective means of improving, first, debtor relief, and second creditor recoveries.

166. Whether a debtor uses Chapter 7, Liquidation, or Chapter 13, Adjustments of Debts of an individual, congress intended bankruptcy relief be effective and should provide the Debtor with a fresh start.

167. Post filing, Defendants would not accept payments directly from Claimant.

168. Post filing, Defendants were not anticipating receiving payments directly from Claimant.

169. Under the terms of the Chapter 13 plan, unsecured Creditors are allowed a 200% disbursement of their filed claims over the course of Claimant's plan.

170. While confirmation of a plan is not a discharge it does **fix the terms** upon which claims are to be settled and both a confirmation order and discharge order are final orders.

171. The CDIA recognizes the finality of confirmation orders and the aforementioned credit reporting industry guidelines are specifically setup to harmonize the bankruptcy code and credit reporting guidelines.

172. Federal Rules of Bankruptcy Procedure ("FRBP") 3004 and 3021 mandate that distributions to creditors are on allowed claims only.

173. A proof of claim must be filed in order for a claim to be allowed. 11 U.S.C §502(a).

174. Thus, failure to file a proof of claim results in zero distributions to a creditor through the plan.

175. In the case of an unsecured nonpriority claim failure to file a proof of claim sets the terms of repayment at $0.00 owed.

176. Item 1 of the official Proof of Claim form promulgated by the Supreme Court does not acknowledge past due amounts on unsecured debts. The same proof of claim form, however, specifically asks for and requires a secured creditor to list the arrearage/past due amounts on a secured claim in item 4.

177. Claimant ordered a three-bureau report from Credit Karma. to ensure proper reporting by Claimant's Creditors.

178. Plaintiff noticed numerous different trade lines on the credit report all reporting inaccurate, misleading, or incomplete information that did not comport with credit reporting industry standards. Specifically, multiple trade lines continued to report Claimant's accounts with past due balances and/or inaccurate balances.

179. In response, Claimant disputed the inaccurate tradelines with Experian Information Solutions, Inc.; Equifax, Inc.; and TransUnion, LLC.

180. Claimant's dispute indicated that the account was not being reported accurately. Claimant noted that the account should not be listed with an inaccurate monthly payment amongst other discrepancies. Lastly, Claimant noted that under *Gorman v. Wolpoff & Abramson,* Here the plaintiff expected the accounts to be reported disputed if the Creditor disagreed with Plaintiff's dispute.

181. Defendant Freedom Mortgage was reporting Plaintiff's account, ending in xxxxxx3153, with a wrongful past due balance beginning at the end of 2023, showing late payments that were made on time and continuing to the Claimant's Chapter 13 bankruptcy.

182. The actions of the Defendants as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

183. The actions of the Defendants as alleged herein are acts in violation of the Consumer Credit Reporting Agencies Act California Civil Code § 1785.25(a).

## FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))

## FREEDOM MORTGAGE/ ALLY BANK – FAILURE TO

## REINVESTIGATE.

184. Claimant realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

185. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

186. Defendants Freedom Mortgage ("FREEDOM") and Ally Bank ("ALLY") violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

187. Notice was given to the Defendants FREEDOM/ ALLY that Claimant was disputing the inaccurate and misleading information, but Freedom Mortgage

an ALLY failed to conduct a reasonable investigation of the information as required by the FCRA.

185. Based on Claimant's dispute, Defendants should have known their accounts were included in Claimant's Chapter 13 plan of reorganization. The most basic investigation would include a simple review of well-established credit reporting industry standards.

186. Claimant alleges Defendants did not review well established industry standards for credit reporting.

187. If Defendants had reviewed such standards Defendants would have seen their reporting was not in compliance and consequently inaccurate and or incomplete.

188. Such an investigation would be unreasonable.

189. Claimant also alleges that Defendants did not investigate whether Claimant filed for bankruptcy, whether their accounts were included, the terms of the plan, or whether or not the terms had been approved.

190. The lack of investigation is unreasonable.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

## EXPERIAN INFORMATION SOLUTIONS, INC. AND EQUIFAX, INC.

191. Claimant realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

192. In disputing the accounts mentioned above, each CRA is required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.

193. The most basic investigation required each CRA to send all relevant information via an ACDV to the furnishers.

194. The CRAs have failed to conduct a reasonable investigation and to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

195. In the alternative Claimant alleges that each CRA has its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.

196. Each CRA is not a passive entity bound to report whatever information a DF provides.

197. Claimant alleges that each CRA is readily familiar with Metro 2 guidelines and credit reporting industry standards.

198. ***In fact, each CRA sponsors and authorizes workshops hosted by the CDIA that teach the following to DFs***:

    a. Do not report delinquencies post-petition pre discharge in the payment history section regardless of Chapter 7 or Chapter 13. Instead report the Metro 2 indicator D.

    b. In Chapter 13 cases do not report past due balances post confirmation.

    c. In Chapter 13 cases do not report balances that are inconsistent with the terms of the Chapter 13 plan.

    d. In Chapter 13 cases do not report monthly payments that are inconsistent with the terms of the Chapter 13 plan.

    e. The above reporting is the correct and accurate way to report debts included in consumer bankruptcy filings.

199. Given the aforementioned, Claimant alleges that each CRA can and does suppress inaccurate information from being reported when DFs provide inaccurate information.

200. Each CRA can and does instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

201. Each CRA failed to conduct a reasonable investigation because any basic investigation would have uncovered that certain DFs were not following credit reporting industry standards.

202. Each CRA would have known that Claimant filed for Chapter 13 based on multiple other accounts reporting as much.

203. Each CRA would have known that Claimant's plan had been confirmed based on multiple other accounts reporting as much.

204. Each CRA would have known that failure to report a CII given that a Chapter 13 was filed did not comport with industry standards.

205. CRA would have known reporting a past due balance post confirmation does not comport with industry standards.

206. Each CRA therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

## FIFTH CAUSE OF ACTION
(Violation of California Consumer Credit Reporting Agencies Act California Civil Code § 1785.25(a))

## FREEDOM MORTGAGE – REPORTING INACCURATE INFRMATION TO CRA(S).

207. Claimant realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

208. In the regular course of its business operations, Defendants FREEDOM/ ALLY routinely furnish information to credit reporting agencies pertaining to transactions between Defendants and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

209. Defendants intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not comport with well-established industry standards.

210. Claimant alleges that Defendants re-reported the information contained herein in violation of California Civil Code § 1785.25(a).

211. Grogan also alleges that Defendants had reason to know that the information reported on Plaintiff's accounts were misleading, inaccurate, incomplete, and did not comport with well-established credit reporting industry standards.

212. Grogan alleges that Defendants had reason to know that by not comporting with well-established industry standards lenders will draw a more negative inference with respect to Claimant's credit worthiness.

213. Claimant alleges that the bankruptcy notices, disputes letters from all three credit reporting agencies, the consumer data industry resource guide, and results of its investigation should have provided notice to Defendants of its

misleading and inaccurate reporting as well as being noticed of the forms sent by the U.S. Bankruptcy Court.

214. Defendants failed to notify Experian Information Solutions, Inc. and Equifax, Inc. that the information Defendants re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).

215. Defendants' communications of false information, and repeated failures to investigate, and correct their inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Claimant's rights.

216. As a direct and proximate result of Defendants' willful and untrue communications, Claimant has suffered actual damages including but not limited to inability to properly reorganize under Chapter 13, reviewing credit reports from all three consumer reporting agencies, time reviewing reports with counsel, sending exhausting amounts of demand letters, diminished credit score, potential loss of subject property, surplus funds of the property sale well over $461,000.00 and such further expenses in an amount to be determined at trial.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

## SIXTH CAUSE OF ACTION
### (VIOLATIONS OF CAL. CIV. CODE §2923.6)

217. Claimant re-alleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

218. Effective January l, 2013, SB900, or the California Homeowner Bill of Rights, amended Cal. Civ. Code §2923.6 and specifically noted that "[i]t is the intent of the Legislature that the mortgage servicer offers the borrower a loan modification or workout plan if such a modification or plan is consistent with its contractual or other authority." Cal. Civ. Code §2923.6(b)

219. Pursuant to Civil Code §2923.6 Defendants FREEDOM and ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC are obligated to evaluate Claimants' requests for any and all foreclosure prevention alternatives, including, but not limited to, a loan modification, and **Defendants must cease all foreclosure activity on the Property.**

220. Yet, FREEDOM recorded the NOS while Claimant's 'Workout-Plan' was supposedly in active review.

221. Defendants continued to pursue the foreclosure of the Subject Property and completed a foreclosure sale without providing Claimant with a reasonable opportunity to modify the underlying mortgage loan.

222. Defendants continued to advance on the foreclosure sale despite the fact that there was a pending loan modification application.

223. Dual tracking is "the practice of pursuing foreclosure proceedings while a borrower's loan modification application is still pending." *Jolley v. Chase Home Fin., LLC,* 213 Cal. App. 4th 872, 904 (2013).

224. In sum, Defendants have been "dual-tracking" and performing deceptive practices of foreclosure of Claimants home in direct contravention of Cal. Civ. Code§2923.6.

225. The intent of the California Legislature in enacting the HBOR was to address the consequences of the subprime mortgage crisis leading to declining real property values and historic levels of foreclosure. Given the vast and devastating impact of the crisis, the objective of the HBOR was to make sure lenders, loan servicers, and their agents were communicating and working with borrowers in

default to assess the borrowers' financial situation and discuss foreclosure alternatives before a foreclosure is initiated by recording a notice of default. The intent of the legislature is clear and the requirements that it has imposed are by no means arbitrary.

226. Defendants' numerous and repeated failures to comply with Civil Code §2923.6 directly undermines the intent of the statute. Defendants' failure to adhere to the statute renders the HBOR essentially meaningless and, if the statue is not enforced, it will serve to perpetuate a cycle that results in far too many homeowners being rendered helpless. As a result, Defendants are liable to Grogan for any and all statutory and/or actual damages, which have resulted from their conduct.

227. Claimant has incurred costs associated with the foreclosure action since its commencement and has sought an assessment of his financial situation and consideration for a first lien loan modification and numerous efforts (over 40) and any other foreclosure prevention options pursuant to the provisions of the HBOR.

As a result of the above-described wrongful acts and omissions, Claimant has been precluded from the rights granted to him by Civil Code §2923.6.

228. As a result of Defendants' wrongful acts and omissions, Defendants FREEDOM and ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC are liable to Claimant for any and all statutory and/or actual damages, which have resulted from their conduct. If Defendants fail to correct their violations, Claimant is entitled to actual damages, Legal-Counsel-fees, and treble damages for Defendants' material and uncorrected violations of Civil Code §2923.6.

229. Claimant has been directly and proximately damaged by Defendants' failure to comply with Cal. Civ. Code §2923.6 in that Claimant was not afforded an adequate opportunity to investigate alternatives to the foreclosure of the subject property. Grogan's inability to investigate these avenues of preserving the subject property from sale stands to cause Claimant irreparable injury in that the subject

property was sold at foreclosure thus depriving Claimant of the right to title and possession of the same.

230. Since Defendants conducted the sale and foreclosed on the Subject Property, Claimant is entitled to the economic damages in the amount that is the greater of treble actual damages or statutory damages of fifty thousand dollars ($50,000) according to proof pursuant to Cal. Civ. Code §2924.12(b)(3).

## SEVENTH CAUSE OF ACTION
### (VIOLATIONS OF CAL. CIV. CODE §2923.55)

240. Claimant realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

241. Pursuant to Civil Code §2924, the recording of a Notice of Default marks commencement of California's non-judicial foreclosure process.

242. A mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent cannot record a notice of default until 30 days after: (i) the mortgage servicer makes "initial contact" with the borrower, as required by Civil Code§2923.55 (b)(2), or (ii) the mortgage servicer satisfies the "due diligence" requirements of Civil Code§ 2923.55(£) if unable to contact the borrower. The notice of default

must include a declaration that the mortgage servicer contacted the borrower as required by the statute or, in the alternative, attempted such contact with due diligence, or that contact was not required because the individual did not meet Civil Code § 2920.5's definition of "borrower." The notice of default must include a declaration that the mortgage servicer contacted the borrower as required by the statute, or, in the alternative, attempted such contact with due diligence, or that contact was not required because the individual did not meet the definition of "borrower" under Civil Code § 2920.5.

243. Pursuant to Civil Code §2923.55(a)(2) as written and applied at the time of the alleged misconduct; the nature of the contact and discussion regarding alternatives to foreclosure must (1) assess the borrower's financial situation and explore options for the borrower to avoid foreclosure; (2) advise the Claimants of the statutory right to request a meeting regarding foreclosure alternatives which would be scheduled within fourteen days; (3) provide a toll-free number to

contact a United States Department of Housing and Urban Development (HUD) certified housing counseling agency for further assistance; and (4) employ due diligence in an effort to contact the Claimant.

244. Plaintiff was at all relevant times a "borrower" as defined by Civil Code §2920.5(c). Defendants FREEDOM and ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC recorded the Notice of Default without a declaration of compliance with Civil Code §2923.55(6)(2). The Defendants failed to contact Claimant as required by Civil Code§ 2923.55(6)(2) to assess his financial situation.

245. Furthermore, at no point at least 30 days prior to recording the Notice of Default did Defendants FREEDOM and ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC respond to Claimants certified-mailings of communication nor advise Claimant of his right to request a subsequent meeting which, if requested, would be scheduled within 14 days.

246. At no point at least 30 days prior to recording the Notice of Default, did Defendants provide Grogan with the toll-free telephone number made available by the United States Department of Housing and Urban Development ("HUD") to find a HUD-certified housing counseling agency.

247. Additionally, at no point at least 30 days prior to recording the Notice of Default, did Defendants contact Claimant in order to either assess his financial situation and explore options to avoid foreclosure, advise of the statutory right to request a meeting regarding foreclosure alternatives, provide a toll-free telephone number to contact a HUD-certified housing counseling agency, or employ due diligence in an effort to contact the Claimant in regards to his requested demands/ communications.

248. Defendants' failure to make actual contact with Claimant did not occur despite its alleged "due diligence."

249. Grogan provided Defendants with his current postal-location, primary and secondary phone numbers. However, at no point at least 30 days prior to recording the Notice of Default did Defendants call Claimant at his primary phone

number at least three times at different hours and on different days and by means such that, if Claimant answered, the call was connected to a live representative.

250. At no point at least 30 days prior to recording the Notice of Default, and within two weeks after satisfying the telephone requirements, did Defendants send Claimant a certified letter, with return receipt requested.

251. At no point at least 30 days prior to recording the Notice of Default did Defendants provide Grogan a means of contact that offered access to a live representative in a timely manner.

252. The Notice of Default was recorded before Defendants contacted, or diligently attempted to contact Grogan to discuss alternatives to foreclosure as contemplated by the statute.

253. HBOR was enacted to combat the foreclosure crisis and hold lenders accountable for exacerbating it. Defendants' failure to comply with the statute's pre-NOD outreach procedures undermines the intent of the statute and serves to perpetuate the servicer misconduct and foreclosure abuses specifically targeted by the HBOR legislation.

254. In addition, **non-compliance with the statute renders the Notice of Default invalid and void as a matter of law.**

255. A trustee's sale cannot proceed unless and until Defendants record a notice of default that contains a declaration that is accurate and supported by competent and reliable evidence.

256. If the declaration is false, then the notice of default itself is false, since the declaration must be attached to the notice.

257. Moreover, the Notice of Default is invalid, since contact, or diligent effort to contact, is a statutory prerequisite to filing the Notice of Default.

258. As a result of Defendants' wrongful acts and omissions, Claimant has incurred costs associated with the improper foreclosure action in that Claimant has been precluded the procedural protections afforded borrowers by the statute and now faces the eviction of the Subject Property.

259. Grogan has sought, and continues to seek, an assessment of their financial situation and consideration for foreclosure alternatives offered by, or through, Defendants, as contemplated by the provisions of HBOR.

260. The extensive passage of time during which Defendants failed to perform as required under Civil Code §2923.55, constituted a substantial and unreasonable delay which contributes to the damages and harm ceased as alleged herein.

261. Primarily substandard contact, servicing, lack of responding to 40 plus certified letters and operations protocols routinely employed by these Defendants caused this delay.

262. Based upon Defendants' conduct in this regard, **all subsequently recorded foreclosure notices are void and carry no legal effect.**

263. In addition, **any subsequently conducted Trustee's Sale is invalid, void, and transfers no interest in the subject property whatsoever.**

264. Claimants' inability to investigate these avenues of preserving the subject property from sale stands to cause Claimant irreparable injury in that the subject property was fraudulently sold at a Trustee's Sale thus depriving Claimant of the right to title and possession of the same.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

265. Pursuant to Civil Code §§ 2924.12 and 2924g, Claimant seeks an order enjoining Defendants from proceeding further damaging to Claimant unless and until Defendants have corrected and    remedied their material violations of Civil Code§ 2923.55.

266. Plaintiff has been directly and proximately damaged by Defendants' failure to comply with Civil Code §2923.55 in that Plaintiff was not afforded an adequate opportunity to investigate alternatives to the foreclosure of the subject property prior to the recording of the NOD.

## EIGHTH CAUSE OF ACTION
### (VIOLATIONS OF CAL. CIV. CODE §2923.7)

267. Claimant realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

268. The SB900 guarantees homeowners a single point of contact from the mortgage servicer when engaged in foreclosure alternative discussions.

269. Cal. Civ. Code §2923.7 provides that "upon request from a borrower who requests a foreclosure prevention alternative, the mortgage servicer shall

promptly establish a single point of contact and provide to the borrower one or more direct means of communication with the single point of contact."

270. Grogan's point of contact was never given or made known.

271. Cal. Civ. Code §2923.7 provides that the single point of contact shall be responsible for coordinating receipt of all documents associated with available foreclosure prevention alternatives and notifying the borrower of any missing documents necessary to complete the application.

272. The purpose of the single point of contact is to avoid mistakes, errors, and delays in processing documentation documents associated with available foreclosure prevention alternatives.

273. Yet Defendants continued to disregard mailings and documentation during the "Document Revolving Door" period and continued to remain silent or ignore, causing the review to never occur, during which time interest, fees and penalties continued to accrue.

274. Furthermore, the absence of responses from the Defendants FREEDOM and ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC

dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC led to Defendants negligently reviewing the 'Workout-Plan'.

275. Said negligent review caused Defendants to issue a denial of the Short Sale Offer based off of an erroneous reading of the Subject Property's chain of title.

276. Claimant's forty (40) plus attempts to create a 'Workout-Plan' has been in review for over a year.

277. Claimant has been directly and proximately damaged by Defendants' failure to comply with Cal. Civ. Code §2923.7 in that Claimant was not afforded adequate opportunity to investigate alternatives to the foreclosure of the Subject Property.

278. By delaying the review process Claimant's principal balance has continued to increase with interest, premium, and late fees.

279. Claimant now faces the loss of the Subject Property and wrongful eviction due to the wrongful foreclosure conducted by the Defendants.

280. Finally, pursuant to CAL. CIV. CODE§ 3294, Claimant is entitled to punitive damages for the sake of example and by way of punishing the Defendants

as they committed fraud on multiple occasions with malice and blatant disregard for the law.

## **NINTH CAUSE OF ACTION**
### (VIOLATIONS OF BUS. & PROF. CODE§§ 17200, ET SEQ.)

281. Claimant realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

282. California Business & Professions Code § 17200 ("UCL") bestows upon individuals a private right of action against unlawful business activities. An "unlawful" business activity under the UCL includes anything that can properly be called a business practice and that violates state law. A business practice is "fraudulent" under the UCL if it is likely to deceive the consuming public.

283. As alleged herein, Defendants FREEDOM and ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC and Does 1 to 50 engaged in deceptive business practices in connection with servicing Claimants' mortgage loan, processing Claimants' requests for an alternative to foreclosure,

initiating and proceeding with foreclosure of the Property, and related matters. The unfair business practices committed by Defendants include, but are not limited to, the following:

a. Failing to implement and follow the requirements of the 2013 California Homeowner's Bill of Rights;

b. Engaging in a pattern and practice of misrepresenting to borrowers, including Plaintiff, the likelihood of qualifying for a loan modification or other work out option, and inducing borrowers to continue with the modification review process while knowing that no such permanent modification would be forthcoming despite assurances otherwise;

c. Violating Civil Code §2923.55, by recording the NOD without sufficiently contacting Claimant or attempting with due diligence to contact Claimant in order to assess the financial situation and explore options to avoid foreclosure.

d. Recording the NOD with **NO Declaration of Compliance** that would have this Court believe that Defendants complied with the provisions of Civil Code

§ 2923.55, prior to recording the Notice of Default on the Subject Property, when; in fact, there was no such compliance.

e. Violating Civil Code §2923.7 by failing to establish a knowledgeable single point of contact who had the ability and authority to perform the responsibilities described in Section 3 2923.7, and ensuring the single point of contact remained assigned to the account until Plaintiffs had been reviewed for all foreclosure prevention alternatives offered by or through the mortgage servicer, Defendant FREEDOM;

f. Violating Civil Code §2923.6 by recording the NOD despite the fact that Claimants Loan was still in active review.

g. Violating Civil Code §2923.6, by failing to fairly evaluate or afford Claimant a fair opportunity to be evaluated, even after there has been a material change in Claimants' financial circumstances, which was made known to the mortgage servicer, Defendant FREEDOM;

h. Engaging in negligent conduct in assessing Claimants' loan for foreclosure prevention alternatives, including any loan modifications;

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

i. Instituting improper or premature foreclosure proceedings to generate unwarranted fees and concealing the true character, PRESTIGE, and nature of their assessment of marked-up fees against Claimant's account;

j. Misrepresenting the foreclosure status to Claimant regarding the property; and attempting to foreclose on the Property without the legal authority or just cause to do so.

284. Defendants' omissions of material facts, as hereinabove alleged, constitute "unlawful" practice because they violate Title 18 United States Code §§1341, 1343, and 1962, California Civil Code§§1572, 1573, 1709, 1710, 1711, 2923.55, 2923.7, 2924.11 and the common law. Defendants' acts and practices, as hereinabove alleged, constitute "unfair" business acts under Bus. and Prof. Code §17200, et seq., in that said acts and practices offend public policy and are substantially injurious to Claimant and all consumers. Said acts and practices have no utility whatsoever, much less sufficient utility to outweigh the substantial harm to Claimant, other consumers, and potential homeowners.

285. These violations were and remain to be a matter of Defendants' standard corporate policy and constitute a consistent pattern and practice of unlawful corporate behavior. Defendants' actions are against public policy, as the legislature enacted the HBOR as an emergency act to slow the foreclosure process so that borrowers have a meaningful opportunity to avoid foreclosure.

286. Defendants knew, or by the exercise of reasonable care, should have known, that the statements and misrepresentatives made by their representatives as alleged herein were violations of public policy, Civil Code§§ 2923.6, 2923.7, 2923.55 and other common law.

287. Defendants' acts and practices, as hereinabove alleged, constitute "fraudulent" business acts under §17200 in that said acts and practices are likely to deceive the public and effect consumers' legal rights and obligations.

288. Defendants' acts, including, but not limited to, active deception, falsifying and/or failing to deliver material documents, and concealment of information, serve to prevent consumers from exercising rights to which they are entitled. Moreover, in the course and conduct of their loan servicing and collection,

Defendants omitted a true itemization that identifies the nature of each fee, and it failed to disclose the nature of the charges and fees assessed. Defendants concealed the fact that the category identified as "Miscellaneous Fees", or "Other Charges" reflects marked-up and/or unnecessary fees that were never incurred by Claimant.

289. Relying on Defendants, Claimant and members of the general public believe they are obligated to pay the amounts specified in Defendants' communications for default-related services.

290. Claimant relied on his reasonable expectation that Defendants complied with the plain meaning of the mortgage agreement, Notes, Security Instruments, court orders, and confirmed plans, and as a result, Claimants relied on Defendants' disclosures about the fees on his statements, reasonably believing the "Other Charges," "Other Fees" or "Miscellaneous Fees" to be valid charges that were not unlawfully marked-up and/or unnecessary.

291. Indeed, to trick borrowers into a sense of trust and to dissuade them from challenging Defendants' unlawful fee assessments. Defendants conceal their scheme by telling borrowers, in statements and other documents, that such fees are

"allowed by borrowers' Note and Security Instrument," or that they are "in accordance with the terms of your mortgage."

292. Had the true nature of the fees been disclosed to Claimant, he would have been aware of the mark-ups and unnecessary nature of the fees, and Claimant would have disputed the charges, not paid them.

293. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent conduct alleged herein, Claimant has lost equity in the Subject Property.

294. Defendants' charging of marked up and excess fees has resulted in damage to Claimants tangible interest in the Subject Property. This loss of equity, which should be credited back to Claimant, constitutes a loss of money.

295. As a direct and proximate result of Defendants' unlawful, unfair and fraudulent conduct, Defendants have wrongfully advanced foreclosure on the Subject Property, which will cause Claimant to have a clouded title to, and interest in, the Subject Property and the imminent eviction of Claimant and family of four children from his home.

296. Due to Defendants' unlawful, unfair, and fraudulent business practices, Claimant has suffered a substantial ascertainable loss and, therefore, pursuant to Business and Professions Code§17203 and §17204, Defendants should be enjoined from continuing such practices.

297. Defendants' unfair and deceptive business acts or practices have caused a direct and proximate injury to Claimant and the general public. Claimant is entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits, which may have been obtained by Defendants as a result of such business acts or practices.

298. Finally, pursuant to CAL. CIV. CODE §3294 Claimant is entitled to punitive damages for the sake of example and by way of punishing/ disciplining the Defendants as they committed fraud on multiple occasions with malice and blatant disregard for the law.

## TENTH CAUSE OF ACTION
### (GENERAL NEGLIGENCE)

299. Claimant realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

300. Defendant owed Grogan a duty of care to deal reasonably with him as a borrower in default and try to effectuate a workable foreclosure prevention plan. (see Alvarez v. BAC Home Loans Servicing LP)

301. By and through the passage of the Homeowner's Bill of Rights, the California legislature has established that these Defendants FREEDOM and ARCHWELL HOLDINGS LLC dba ARCHWELL MANAGEMENT LLC dba NESTOR SOLUTIONS LLC/ NESTOR TRUSTEE SOLUTIONS LLC are under the duty to competently process Claimants loan modification application and to refrain from making misrepresentations related to the loan modification process, or the foreclosure of the Subject Property.

302. By holding themselves out to offer loan modification alternatives to foreclosure and providing a means for Claimant to submit applications and documentation for loan modification alternatives to foreclosure, the Defendant has been under a duty to handle the submission, application, and processing of loan modification documents competently and in a non-negligent manner.

303. Defendants expressly offered and agreed to review Claimant for loan modification candidacy. In so agreeing, Defendant is under a duty to competently process Claimants loan modification and to refrain from making misrepresentations related to the loan modification process, or the foreclosure of the subject property.

304. Defendants breached their duty of care by continuing to advance the foreclosure sale while the Account was in review.

305. Defendants breached their duty of care by absence of responding and ignoring documents sent to them by the Claimant and continually ignoring such mailings, causing the review to be delayed for several months during which time interest, fees and penalties continued to accrue.

306. Defendants breached their duty of care by denying the 'Workout-Plan' based on a false reading of the Subject Property's chain of title.

307. The potential harm to Claimant from negligent mishandling the Account review was readily foreseeable to the Defendant; the loss of an opportunity for Claimant to keep the family home is the inevitable outcome.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.   SECOND AMENDMENT TO COMPLAINT

308. Although there is still no guarantee that workout will be granted, the ignoring of the documents and the negligent review of Claimants financials, deprived Claimant of the possibility of obtaining the requested relief and has now put Claimant in a position where he is facing the loss of the Subject Property to wrongful foreclosure.

309. The injury to Claimant is certain, in that he was deprived of the opportunity to obtain a foreclose prevention workout and he is at imminent risk of being evicted of the Subject Property.

310. There is a close connection between Defendant's conduct and any injury actually suffered, because, to the extent Claimant otherwise qualified arid would have been granted a modification, Defendant's conduct in negligently mishandling Claimants communications and submitted documents/ mailings directly precluded the loan modification application from being timely processed

311. The existence of a public policy of preventing future harm to home loan borrowers is shown by recent actions taken by both state and federal government to help homeowners struggling in the home foreclosure crisis.

312. At all times material, Defendants failed to exercise prudence and diligence in the servicing of Claimants loan.

313. As a proximate result of Defendants' negligent conduct, Claimants loan balance continued to increase as interest continued to accrue and Defendants continued to apply unjustifiable and unnecessary penalties and late fees to the principal balance.

314. Claimant will continue to suffer, general and special damages in an amount according to proof at trial.

315. As a proximate result of Defendants' negligent conduct Claimant was unable to determine whether other foreclosure prevention alternatives were available to him resulting in him now facing the loss of his home to foreclosure.

316. Claimant's additional causes of action and/ or documentation will be amended with a future filing including additional exhibits and Defendants known and unknown with such amendment as additional discovery is performed and will reveal.

Wherefore, Claimant prays for judgment as hereinafter set forth.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A. SECOND AMENDMENT TO COMPLAINT

## PRAYER FOR THE RELIEF

WHEREFORE, Claimant prays for judgment as follows:

1. For permanent injunctive relief to stop Defendants from engaging in the conduct described above leading to eviction of Claimant of the Subject Property;

2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;

3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31

4. Award legal fees and costs of claim incurred herein pursuant to 15 U.S.C. §1681n & o; California Civil Code § 1785.31;

5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o;

7. For a decree declaring the NOD is void;

8. For a decree canceling and voiding the NOD;

9. For a decree declaring the NTS is void;

10. For a decree canceling and voiding the NTS;

11. For a decree declaring the conduct of Defendants as alleged herein to be an unlawful violation of the UCL;

12. For such further decrees as the Court deems appropriate to declare the rights and obligations, which the parties have toward each other in connection with the subject property;

13. For restitution in an amount to be proven at trial;

14. For compensatory, special, and general damages according to proof against all Defendants.

15. Pursuant to Business and Professions Code§ 17203, that all Defendants, Their successors, agents, representatives, employees, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition in violation of§ 17200, including, but not limited to, the violations alleged herein.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT

16. For civil penalties pursuant to statute.

17. For statutory damages in the amount of the greater of treble actual damages incurred or $50,000 pursuant to Civil Code §2924. l2(b);

18. For reasonable legal-counsel's fees and costs according to proof pursuant to 2924.12(i).

19. For reasonable costs of suit and such other and further relief as the Court deems proper.

20. For punitive damages for the sake of example and by way of punishing the Defendants as they committed fraud on multiple occasions with malice and blatant disregard for the law.

21. For other such relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Claimant hereby demands trial of this matter by jury.

## JURISDICTION AND VENUE

1. The UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA has original jurisdiction pursuant to 28 U.S.C. § 1332(a),

because the parties are citizens of different states and the matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000. The Defendants are '***in complete diversity***' and the amount in controversy exceeds $75,000.

2. This Court has jurisdiction under 28 U.S.C.§ 1331, 1337, and 1367, and 15 U.S.C. § 1681.

3. Proper venue lies in the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the acts and omissions giving rise to Claimant's claims occurred in San Diego County, California.

4. Pursuant to 28 U.S. Code § 1331 - Federal question, *"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."* (June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85–554, § 1, July 25, 1958, 72 Stat. 415; Pub. L. 94–

574, § 2, Oct. 21, 1976, 90 Stat. 2721; Pub. L. 96–486, § 2(a), Dec. 1, 1980, 94 Stat. 2369.)

5. Under Article III of the Constitution, federal courts can hear "all cases, in law and equity, arising under this Constitution, [and] the laws of the United States..." US Const, Art III, Sec 2. The Supreme Court has interpreted this clause broadly, finding that it allows federal courts to hear any case in which there is a federal ingredient. Osborn v. Bank of the United States, 22 US 738 (1824).

6. Pursuant to 28 USC § 1446(d) *"When the notice of removal is filed and the state court is notified, the state court loses all power to proceed with the case."*

7. Pursuant to 28 USC § 1441(f) *"an action may be removed to federal court even though the state court where it was filed lacked jurisdiction over it (f)Derivative Removal Jurisdiction.—The court to which a civil action is removed under this section is not precluded from hearing and determining*

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.   SECOND AMENDMENT TO COMPLAINT

*any claim in such civil action because the State court from which such civil action is removed did not have jurisdiction over that claim.*"

## **VERIFICATION**

I, BRIAN A. GROGAN, am the claimant [plaintiff] in this above-entitled action. I have read the foregoing document and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed at El Cajon, California this 8th day of October 2024.


By:_____
     brian-anthony: grogan dba BRIAN A. GROGAN(sic)
     SPC/ A.R./ Attorney-in-Fact/ Bailee.

CLAIMANT, : brian-anthony: grogan dba GROGAN, BRIAN A.  SECOND AMENDMENT TO COMPLAINT